**Richard BURGESS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 95–CM–1352.

District of Columbia Court of Appeals.

Argued Nov. 30, 1995.

Decided July 22, 1996.

See also 680 A.2d 1033.

 

TERRY, Associate Judge:

Appellant Burgess was convicted of assault[1] and destruction of property,[2] both misdemeanors, after a non-jury trial. On appeal from those convictions, he contends on various grounds that he was denied his constitutional right to a trial by jury. This court en banc, in an opinion issued today, has rejected his principal constitutional argument and has referred the remaining issues presented on appeal to this panel of the court, chosen by lot in the usual manner. *Burgess v. United States,* 680 A.2d 1033 (D.C.1996) (en banc). After hearing further argument, we reject the remainder of appellant's constitutional claims and his assertions of trial court error and affirm the judgment of conviction.

I

Burgess was arrested after an altercation with Daryl Selden, a bus driver for the Washington Metropolitan Area Transit Authority, in which Mr. Burgess sprayed mace at Mr. Selden and smashed the window of the bus he was driving. Mr. Selden had been headed north on 14th Street, N.W., when he saw Burgess running across the street as if he wanted to catch the bus. Although there was no regular bus stop there, Mr. Selden testified that he made a "courtesy stop" at 14th and P Streets and allowed Burgess to board. Burgess presented an expired transfer, however, and Selden told him that the transfer was not valid and that he would have to pay his fare. Because Burgess was disabled, he could have paid a reduced fare, but to do so he had to display a pass with his picture on it. Mr. Selden told him this, but Burgess did not produce such a pass and put only twenty cents in the fare box. Apprehensive that Burgess "might become aggressive or hostile," Selden allowed him to remain on the bus.

After the bus had traveled three or four blocks, Burgess came forward and asked Selden for a transfer, which Selden refused to give him until he either paid the full fare or showed him his disabled-person pass. In response, according to Selden's testimony,

Steven G. Polin, appointed by the court, Washington, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Chrisellen R. Kolb, Assistant United States Attorneys, were on the brief, for appellee.

Jeffrey B. Coopersmith, with whom John Vanderstar, Carol Elder Bruce, Georgia Kazakis, Ellen L. Chubin, and Arthur B. Spitzer were on the brief, for amicus curiae, the American Civil Liberties Union of the National Capital Area.

Kathleen Sutherland, Christopher Warnock, and Colin Dunham filed a brief, Washington, for The Jury Trial Group as amicus curiae.

Before FERREN, TERRY, and KING, Associate Judges.

1. D.C.Code § 22–504(a) (1996).

2. D.C.Code § 22–403 (1996).

Burgess called him "a number of choice names and told [Selden] what he was going to do to [him]." Just then the bus reached the next stop at U Street, a major transfer point, and Selden opened the door for passengers to board. Burgess began again to call Selden names and reached into his bag for what Selden thought might be a knife or a gun. Selden applied the parking brake, got up out of his seat, and warned Burgess not to use whatever it was that he was reaching for in his bag. Burgess nevertheless pulled out a canister of mace and attempted to spray Selden with it. Though the canister misfired and only sputtered mace from the nozzle, some of the mace landed on Selden's hands.

Burgess then ran past Selden and out the front door. From outside he began to throw rocks and bottles at the bus. Selden tried to ignore him and returned to his seat to resume the journey, but Burgess went out into traffic and started beating on the window next to the driver's seat. Smashing this window with his fist, Burgess reached through the broken glass and sprayed mace on Selden's left hand and on his uniform. Then, seeing that he had been cut by the broken glass, Burgess ran across the street to the Reeves Municipal Center, where he told Metropolitan Police Officer Scott Dignan that he had just been assaulted. Leaving Burgess with his partner, Officer Dignan went outside to investigate. After speaking with Mr. Selden and others and viewing the damage to the bus and the broken bottles on the ground nearby, Officer Dignan directed his partner to place Mr. Burgess under arrest.

Burgess filed a pre-trial motion requesting a trial by jury. His motion was consolidated with several others filed by other defendants and denied by the court in a lengthy memorandum opinion. *United States v. Joseph, et al.*, 122 Daily Wash. L. Rptr. 2337 (D.C.Super.Ct. October 7, 1994). A subsequent petition for a writ of mandamus, seeking the same relief, was denied by this court in an unpublished order. *Burgess v. Canan*, No. 94–SP–1434 (D.C. December 7, 1994).

The case then went to trial before another judge of the Superior Court, sitting without a

jury. After Mr. Selden testified, defense counsel made a motion to strike that part of his testimony in which he said that he had been sprayed with mace. Counsel asserted that in his pre-trial discussions with government attorneys he had been repeatedly told that the assault charge was founded on the attack with the rocks and bottles, and that the government considered Burgess' use of mace to have been a failed attempt to commit an assault, so that testimony about the mace would be introduced only as "other crimes" evidence. *See Drew v. United States*, 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). Because of these assurances, counsel maintained, the court should strike Selden's testimony insofar as it related to his being struck by mace or mace vapors. The court denied the motion.

Mr. Burgess testified in his own defense. He said that he had his disabled-person pass with him when he boarded the bus, but that he had to sit down to look for it in his pocketbook. He had not found it, however, when the bus reached 14th and U Streets, where he intended to change buses; consequently, when he asked for a transfer at that point, the driver refused to give him one. He and the driver got into an argument, and Burgess took out his can of mace to defend himself. After he had alighted, Mr. Selden followed him off the bus and came after him. Burgess claimed that he then threw the bottles in self-defense because Selden was pursuing him with "something in his hand behind his back." He denied breaking the window on the bus. He also denied that he had injured his hand, even though Officer Dignan had seen it bleeding.

At the conclusion of all the evidence, defense counsel made a motion for judgment of acquittal on the charge of assault. Counsel repeated his claim that the conduct underlying this charge was that Burgess had thrown rocks and bottles at Selden. Because the government had offered no proof that any of the rocks or bottles had actually struck Mr. Selden, said counsel, a critical element of proof was lacking. Counsel asked the court to disregard Selden's testimony that he had been struck by the mace, arguing that because the prosecutors had assured him that

they considered the attack with rocks and bottles to constitute the assault, a variance had occurred between the facts alleged and the facts actually proven. Counsel also complained that he had been "surprised" by the evidence presented and that, as a consequence, he was insufficiently prepared for trial. When pressed by the court to explain how he had been prejudiced, however, counsel replied only that "the Government's theory of the case is that Mr. Burgess did something other than trying to mace Mr. Selden in assaulting him." The court denied the motion for judgment of acquittal and found Burgess guilty as charged.

## II

Appellant claims that the trial court violated his rights under the Sixth Amendment when it denied him a trial by jury for the two crimes with which he was charged, assault and destruction of property. According to appellant, the Council of the District of Columbia, our local legislature, considers them both to be serious crimes. Because being charged with a serious crime is the litmus test for determining whether a jury trial is required, he contends that his conviction should be reversed and the case remanded for a new trial before a jury.

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." The Supreme Court has held that the right to a jury trial is a fundamental right, "granted to criminal defendants in order to prevent oppression by the Government." *Duncan v. Louisiana*, 391 U.S. 145, 155, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968). At the same time, however, the Court has recognized "that there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision...." *Id.* at 159, 88 S.Ct. at 1453 (footnote omitted); *accord, Blanton v. City of North Las Vegas*, 489 U.S. 538, 541, 109 S.Ct. 1289, 1292, 103 L.Ed.2d 550 (1989). By thus restricting the Sixth Amendment right to "serious" as opposed to "petty" offenses, the Supreme Court has adhered to the long-held view, antedating the Constitution itself, that "the possible con-

sequences to defendants from convictions for petty offenses [are] insufficient to outweigh the benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive nonjury adjudications." *Duncan, supra,* 391 U.S. at 160, 88 S.Ct. at 1453.

■ To distinguish "serious" from "petty" offenses, the Court looks to "objective standards such as may be observed in the laws and practices of the community taken as a gauge of its social and ethical judgments." *District of Columbia v. Clawans,* 300 U.S. 617, 628, 57 S.Ct. 660, 663, 81 L.Ed. 843 (1937). "[T]he most relevant such criteri[on]," the Court has said, is "the severity of the maximum authorized penalty," *Baldwin v. New York,* 399 U.S. 66, 68, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970) (plurality opinion), because the legislature, in fixing that penalty, "include[s] within the definition of the crime itself a judgment about the seriousness of the offense." *Frank v. United States,* 395 U.S. 147, 149, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969). Following these and other precedents, the Court in *Blanton* established a presumption that, for Sixth Amendment purposes, an offense carrying a maximum authorized prison term greater than six months would be considered "serious" and jury-triable, whereas an offense with a maximum authorized prison term of six months or less would be considered "petty" and not jury-triable. 489 U.S. at 543, 109 S.Ct. at 1293. Although the Court acknowledged that the "seriousness" of a crime may be reflected in "other penalties that [the legislature] attaches to the offense," the Court was emphatic in stating that "incarceration is an 'intrinsically different' form of punishment" providing "the most powerful indication of whether an offense is 'serious.'" *Id.* at 542, 109 S.Ct. at 1292 (citation omitted). "The judiciary should not substitute its judgment as to seriousness for that of a legislature, which is 'far better equipped to perform the task....'" *Id.* at 541, 109 S.Ct. at 1292 (citation omitted).

In *United States v. Nachtigal,* 507 U.S. 1, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993), the Court said once again that "[t]he best indicator of society's views is the maximum penalty

set by the legislature" and reiterated the *Blanton* holding that a crime with a maximum penalty of six months or less is presumptively "petty." *Id.* at 3, 113 S.Ct. at 1073. The Court then went on to discuss how a defendant could rebut the *Blanton* presumption:

> A defendant can overcome this presumption, and become entitled to a jury trial, *only* by showing that the additional penalties, viewed together with the maximum prison term, are so severe that the legislature clearly determined that the offense is a "serious" one.

*Id.* (citation omitted; emphasis added).

For several decades, both assault and destruction of property were jury-triable offenses in the District of Columbia. Assault was punishable by a fine of not more than $500 or imprisonment for not more than twelve months, or both, and destruction of property with a value of less than $200 was punishable by a fine of not more than $1,000 or a prison term of not more than one year, or both. *See* D.C.Code § 22–504 (1989) (assault); *id.* § 22–403 (destruction of property).[3] Under another statute, D.C.Code § 16–705(b) (1989), in any case involving a fine of more than $300 or imprisonment for more than ninety days (or six months when the offense was contempt of court), the defendant had a right to a jury trial on demand.

All of these statutes have recently been amended by the Council. First, section 16–705(b) was changed in 1993 to authorize a jury trial only when the offense carries a possible fine of more than $1,000 or possible imprisonment for more than 180 days (with the same six-month exception for contempt of court).[4] Criminal and Juvenile Justice Reform Amendment Act of 1992, D.C. Law 9–272, § 202, 40 D.C.Reg. 796, 799 (effective May 15, 1993); *see* D.C.Code § 16–705(b) (1996 Supp.). Then, a little more than a year later, the Council enacted the Omnibus Crim-

inal Justice Reform Amendment Act of 1994 (OCJRAA), D.C. Law 10–151, 41 D.C.Reg. 2608 (effective August 20, 1994). A key provision of this act incorporated several parts of an earlier legislative proposal, known as the "Misdemeanor Streamlining Act," which reduced the maximum penalties for a variety of crimes so as to make them non-jury-demandable. Section 105(c) of the OCJRAA reduced the maximum penalty for misdemeanor destruction of property to a fine of not more than $1,000 or imprisonment for not more than 180 days, or both. Section 105(d) made the same reduction in the penalty for assault. *See* D.C.Code §§ 22–403 (1996), 22–504(a) (1996).[5]

▮▮▮▮▮ Viewing these statutory changes in light of the relevant Supreme Court cases, particularly *Blanton* and *Nachtigal*, we are compelled to hold that assault and misdemeanor destruction of property are no longer jury-demandable crimes in the District of Columbia because the Council has reduced them to "petty" offenses, as that term is defined in Sixth Amendment jurisprudence. That a legislative body such as the Council has the power to do this is beyond doubt. See *Nachtigal*, 507 U.S. at 3, 113 S.Ct. at 1073; *Blanton*, 489 U.S. at 542–543, 109 S.Ct. at 1292–1293. Neither of these offenses is punishable by sufficiently harsh penalties, in addition to imprisonment, to break through the presumptive six-month ceiling and be deemed "serious." See *Nachtigal*, 507 U.S. at 4, 113 S.Ct. at 1074; *Blanton*, 489 U.S. at 543, 109 S.Ct. at 1293; *see also Brown v. United States*, 675 A.2d 953, 954–955 (D.C. 1996); *Foote v. United States*, 670 A.2d 366, 372–373 (D.C.1996).

Burgess urges us nevertheless to examine the legislative history of the OCJRAA. Such an examination, he maintains, will reveal that although this legislation effected a facial reduction in the maximum sentences for assault and destruction of property, the Council nev-

---

3. If the value of the property is $200 or more, its destruction is a felony punishable by a fine of not more than $5,000 or imprisonment for up to ten years, or both. D.C.Code § 22–403 (1996).

4. For a discussion of the difference between 180 days and six months, *see Turner v. Bayly*, 673 A.2d 596 (D.C.1996).

5. Another statutory change, enacted in late 1993, had added language to section 22–504 defining a new crime of stalking. *See* D.C.Code § 22–504(b)-(e) (1996).

er intended to transform these crimes into "petty" offenses. In Burgess' view, the statutory changes were really a "transparent attempt by the D.C. Council to deny defendants the right to a jury trial by the wholesale rewriting of the misdemeanor code. . . ." He claims that the legislative history demonstrates that the Council actually sought to *increase* the likelihood and the severity of sanctions for crimes such as these by forcing accused persons to defend themselves in front of judges rather than jurors.[6]

We decline on several grounds Burgess' invitation to explore the legislative history. In the first place, we rejected a virtually identical argument in *Stevenson v. District of Columbia*, 562 A.2d 622, 623 n. 1 (D.C.1989) (refusing "to search the . . . legislative history for additional indications that the Council believed driving under the influence to be a 'serious' offense"). We did so again very recently in *Foote v. United States, supra*, 670 A.2d at 369–370. We are bound by *Stevenson* and *Foote*, which are dispositive here. *See also Brown v. United States, supra*, 675 A.2d at 955. Moreover, we have no doubt that legislators regard all crimes committed against their constituents to be serious. Whether a crime is "serious" for Sixth Amendment purposes, however, is a question that can be answered only by the sort of analysis prescribed by the Supreme Court in *Blanton* and *Nachtigal*. We note that with all the opportunities the Supreme Court has had to consider this issue, it has *never* suggested that legislative history might be considered as a gauge of whether a particular offense is "serious" or "petty."

■ There is also a decided lack of ambiguity in the statutes involved here, a fact which makes it inappropriate to consider the legislative history. This court has often said that "[i]f the meaning of a statute is plain on its face, resort to legislative history or other extrinsic aids to assist in its interpretation is not necessary." *United States v. Young*, 376 A.2d 809, 813 (D.C.1977). It is true that there is "no rule of law forbidding resort to *explanatory* legislative history no matter how 'clear the words may appear on superficial examination.'" *Harrison v. Northern Trust Co.*, 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943) (citations omitted; emphasis added), cited in *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983) (en banc). However, the Supreme Court has also held that "the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). What this means, plainly stated, is that if the statute is clear and unambiguous on its face, the motivation of the legislature that enacted it, or of individual legislators, is of no concern to a court that is called upon to enforce it.[7]

---

6. For example, Burgess cites (as does *amicus* ACLU) the comments of Councilman Harold Brazil, a co-sponsor of the "misdemeanor streamlining" bill, during a legislative session:

    [T]here was a reluctance on the part of Members to do something that essentially may or seemed to be a lessening of the society's response to a criminal offense. . . . [T]he misdemeanor streamlining didn't let people go any easier, or it didn't lessen the punishment. In fact, it really made the punishment . . . potentially more severe because, with misdemeanor streamlining, you will serve a maximum of more time than you would under the current system. . . . I think we want to be strict. We just want an efficient system of being strict.

7. Even if we were to consider the legislative history of the OCJRAA, that history lacks the "explanatory" character of which the Supreme Court spoke in *Harrison*. We have read the

excerpts of Council hearings provided by appellant and *amicus* ACLU. We have also read, however, the committee report on the bill which became the OCJRAA. That report paints quite a different picture:

    There has also been a change in [the] character of the crimes, becoming more violent and more random. *Areas once sacrosanct are now being invaded, with shootings and deaths occurring near schools, recreation areas and ballparks.* The Council, in its continued fight, must look at all options to increase public safety, *including redefining crimes*, reviewing management, and reallocating of resources.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, Report on Bill 10–98, at 2 (January 26, 1994) (emphasis added). Whatever seriousness individual legislators such as Mr. Brazil, *supra* note 6, may have continued to attach to certain misdemeanors, it is apparent that the

**1096**

Finally, we note that the same legislature that reduced the penalties for assault under section 22–504 also created *at the same time* a new felony called "aggravated assault." D.C.Code § 22–504.1 (1996), enacted as part of the OCJRAA, states in part:

(a) A person commits the offense of aggravated assault if:

(1) By any means, that person knowingly or purposely causes serious bodily injury to another person; or

(2) Under circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury.

The maximum penalty for aggravated assault is a $10,000 fine or ten years' imprisonment, or both. D.C.Code § 22–504.1(b). Even an attempt to commit an aggravated assault is punishable by a fine of up to $5,000 or imprisonment for up to five years, or both. *Id.* § 22–504.1(c). This new section, proscribing conduct that is, on its face, more threatening to the community than the misdemeanor assault already covered by section 22–504 (now 22–504(a)), shows that the Council knew how to define a "serious" crime when it felt a need to do so.

For these reasons, we hold that appellant Burgess was not entitled to a jury trial for either of the crimes with which he was charged.

### III

■ Burgess claims that the trial court erred in not acquitting him of assault. According to Burgess, the government had consistently represented prior to trial that it considered the throwing of rocks and bottles, rather than the use of mace, to be the conduct underlying the assault charge. From this premise he argues that the admission of evidence that the complainant was sprayed with mace amounted to a "variance" requiring reversal of his assault conviction. In addition, he contends that the government's

failure to inform defense counsel that the use of mace constituted the act underlying the charge of assault violated Super. Ct.Crim. R. 16, the rule governing discovery in criminal cases.

■ A variance occurs when the evidence at trial proves facts materially different from those alleged in the indictment or information. *Gaither v. United States*, 134 U.S.App.D.C. 154, 164, 413 F.2d 1061, 1071 (1969). A variance may give rise to constitutional problems when, among other things, it causes a defendant to be misinformed of the charges so that he or she is inadequately prepared for trial. *See Scutchings v. United States*, 509 A.2d 634, 636 (D.C.1986). The Supreme Court has made clear, however, that when the offense of which a defendant was actually convicted "was clearly set out in the indictment [or information]," the conviction will generally be upheld. *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985); *see Joseph v. United States*, 597 A.2d 14, 18 (D.C.1991), *cert. denied*, 504 U.S. 928, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992).

■ There was no variance in this case. The charge against Burgess, as stated in the information, was that he "unlawfully assaulted and threatened in a menacing manner Daryl Selden, in violation of Section 22–504, District of Columbia Code." The government did not specify in the information the means by which the assault was committed, but it had no obligation to do so. *See Ingram v. United States*, 592 A.2d 992, 1006–1007 (D.C.), *cert. denied*, 502 U.S. 1017, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991). This court has observed that assaults "tend to be committed in a single continuous episode rather than in a series of individually chargeable acts," so that a series of assaultive acts occurring in a short period of time, as in this case, will usually constitute only a single assault. *Owens v. United States*, 497 A.2d 1086, 1096 (D.C.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986); *see Glymph v. United States*, 490 A.2d 1157, 1160–1161 (D.C.1985). Thus it makes no dif-

committee responsible for the bill viewed them to be relatively petty compared with shootings that

were occurring in formerly "sacrosanct" areas of the city.

ference whether the government proves an assault by introducing evidence that the defendant sprayed mace on the complainant or by proving that he threw rocks and bottles. We are not confronted here with a situation in which the prosecution attempted to prove a different offense from the one that was charged in the information. *See Barker v. United States,* 373 A.2d 1215, 1219 (D.C. 1977).[8]

 We also find no violation of Rule 16. Under that rule, a defendant, upon request, has the right to gain access to various items in the government's possession, including statements by the defendant, documents and tangible objects that are material to the defense, reports of physical or mental examinations or scientific tests, and written summaries of expert testimony intended to be introduced during the government's case in chief. The government's theory of the case, however, is not covered by Rule 16 and thus is not subject to Rule 16 disclosure. Moreover, the fact that the mace made contact with Mr. Selden was revealed only through his testimony at trial, and "testimony, by itself, is not discoverable under Superior Court Rule 16...." *McIntyre v. United States,* 634 A.2d 940, 945 (D.C.1993).

On appeal, Burgess makes a more general claim that he lacked the information necessary to prepare his defense properly. Both in his brief and at oral argument, counsel for appellant repeated his claim that he was "surprised" by the witnesses' account of the events leading to his client's arrest. The defect in this claim is that the defense never sought a bill of particulars to obtain any information to which it was entitled under Super. Ct.Crim. R. 7(f). That rule "cast[s] some of the burden on a defendant to pursue additional details" of the charge against him. *Hsu v. United States,* 392 A.2d 972, 977 (D.C.1978); *see United States v. Debrow,* 346 U.S. 374, 378, 74 S.Ct. 113, 115–16, 98 L.Ed.

92 (1953); *Nichols v. United States,* 343 A.2d 336, 343 (D.C.1975). In this case defense counsel appears to have assumed none of that burden. In any event, counsel never articulated any prejudice resulting from the alleged lack of information about the assault, and we cannot discern any prejudice from the record. Consequently, we see no reason to reverse the conviction on this ground.

The judgment of conviction is accordingly *Affirmed.*

---

8. Even if a variance could be demonstrated in this case, appellant's claim would fail. When asserting a variance, a defendant has the affirmative obligation to show prejudice to the defense. *Barker v. United States, supra,* 373 A.2d at 1218. Defense counsel made no demonstration of prejudice to the trial court. In response to the court's specific question about prejudice, counsel

merely stated that the government's theory of the assault was based on throwing rocks and bottles and not the use of mace. "Appellant [did] not claim, however, that his defense would have been different...." *Berger v. District of Columbia,* 597 A.2d 407, 410 (D.C.1991).